623 A.2d 656

Michael B. MONIAS

v.

Glenna ENDAL et vir.

No. 53, Sept. Term, 1992.

Court of Appeals of Maryland.

April 27, 1993.

William A. Ehrmantraut and David A. Roling (Wharton, Levin, Ehrmantraut, Klein & Nash, all on brief), Annapolis, for petitioner.

Steven Nemeroff (Wortman, Nemeroff & Bulitt, all on brief), College Park, for respondent.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), Specially Assigned.

CHASANOW, Judge.

The instant case raises issues of how damages should be calculated for loss of household services and loss of wages where the plaintiff's normal life expectancy was reduced considerably as the result of defendant's medical malpractice. Glenna Endal and her husband, Andrew, filed a medical malpractice action against Ms. Endal's gynecologist, Dr. Michael Monias. Specifically, the Endals alleged that Dr. Monias was negligent in failing to diagnose and treat a breast cancer in Ms. Endal. They further alleged that had the cancer been properly diagnosed and treated, there was an 85–90% chance that it would have been cured, but that because it was not properly diagnosed and treated, the cancer spread to the point that Ms. Endal's chances of surviving beyond November, 1992 were only 20%.

Evidence presented at trial established that on August 2, 1986, Glenna Endal, a 34 year-old married school teacher and mother of three children, discovered a small lump in her right breast. Six days later, she went to her gynecologist,

Dr. Michael Monias, and was assured the lump was "fibrocystic breast disease," and there was "nothing to worry about." Dr. Monias ordered a mammogram, but did not order a biopsy. Ms. Endal was instructed to return in six months. Six months later, as instructed, Ms. Endal returned to Dr. Monias again complaining of the lump, again a mammogram was ordered, but not a biopsy, and again Ms. Endal was assured there was nothing to worry about. Approximately eight months after her second visit, fourteen months after her first complaint, Ms. Endal returned to Dr. Monias still complaining about the lump. Dr. Monias then referred Ms. Endal to a specialist who performed a biopsy which revealed a malignant tumor. A lumpectomy was also performed which revealed the cancer had metastasized and was now in an advanced stage. There was ample testimony supporting the jury's finding that Dr. Monias was negligent in ordering only a mammogram and in failing to perform a needle biopsy or various other diagnostic tests upon Ms. Endal's visit in August, 1986.

According to expert medical testimony, if the breast cancer had been properly diagnosed in August, 1986, Ms. Endal would have had an 85–90% probability of survival and a normal life expectancy. If properly diagnosed, she could have been successfully treated with a lumpectomy and radiation treatment. There was testimony that as a proximate result of the negligence of Dr. Monias, the cancer metastasized and spread to eleven lymph nodes. Consequently, the experts testified, Ms. Endal had only a 20% chance of survival beyond November, 1992.

The trial judge, Goudy, J., submitted the case to the jury on written issues. Out of an overabundance of caution, the judge divided the elements of damages into damages before November, 1992, which was the statistically probable date of Ms. Endal's premature death, and damages after November, 1992, which were called "post premature death" dam-

ages.[1] In the latter category were (1) loss of income for the period between Ms. Endal's probable date of death from cancer to her probable retirement date at age 65 had her cancer been diagnosed and treated, and (2) loss of services to the children from Ms. Endal's probable date of death until the youngest child reached age 18.

A jury found Dr. Monias was negligent and awarded damages using an "Issue Sheet" as follows:

"1. The medical expenses incurred in the past—$28,-682.00;

2. The medical expenses reasonably probable to be incurred in the future—$125,000;

3. The "Noneconomic Damages" sustained in the past and reasonably probable to be sustained in the future. All damages which you find for pain, suffering, inconvenience, physical impairment, disfigurement, past and future—$200,000;

4. Loss of income in past—$0.00;

5. Loss of income in future to date of premature death—$33,000;

6. Loss of Consortium—$75,000;

POST PREMATURE DEATH:

7. Loss of income or earnings—$250,000;

8. Loss of household service to children—$200,000"

---

1. Dr. Monias objected to this instruction, but he acknowledges that the statistically probable date of Ms. Endal's premature death might have some relevance because, although there can be no recovery for reduced life expectancy, there can be recovery for the mental anguish caused by knowledge that one has a reduced life expectancy. *Rhone v. Fisher,* 224 Md. 223, 231–32, 167 A.2d 773, 778 (1961) (damages may not be recovered for shortening of life, but evidence relating to shortening of life may be considered for its bearing on the pain, suffering, and mental anguish of the plaintiff).

Issues involving the court's instruction in the instant case that were decided by the Court of Special Appeals in its unreported opinion are not encompassed in this Court's grant of certiorari. We in no way suggest approval of the splitting of damages into pre and post premature death damages.

Dr. Monias appealed the judgment to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court affirmed the jury's determination of liability and affirmed all damage awards except for the $200,000 "post premature death" damage award for the loss of Ms. Endal's household services to her children.

We granted certiorari to review the damage awards for loss of income and loss of services. We shall affirm the decision of the Court of Special Appeals.

## I. LOSS OF INCOME

The jury awarded Ms. Endal $33,000 for future loss of income up to the statistically expected date of Ms. Endal's premature death, which had an 80% probability of being no later than November, 1992. The jury also awarded $250,-000 for loss of income after November, 1992. There was evidence that, had her cancer been diagnosed and successfully treated, Ms. Endal would have worked until age 65. There was also testimony from an economist that Ms. Endal's earnings from November, 1992 until her 65th birthday, reduced to present value, would have been in excess of $250,000. Dr. Monias does not contest the $33,000 loss of future earnings award, but he contends that the $250,000 "post premature death" loss of future earnings award was improper and was, in effect, a wrongful death award in a personal injury action.

We begin our discussion by noting that we are dealing with loss of earnings recoverable in a personal injury action. We are not concerned with loss of earnings in a survival action.[2] We are also not concerned with loss of earnings in a wrongful death action, although plaintiff's recovery in this action will obviously preclude a subsequent

---

2. A decedent's lost future earnings are not recoverable in a survival action in Maryland. For damages that are recoverable in a survival action, see *Stewart v. United Elec. Light & Power Co.*, 104 Md. 332, 343, 65 A. 49, 53 (1906) and *Rhone*, 224 Md. at 229–30, 167 A.2d at 777.

claim for loss of support in a wrongful death action for at least the same years included in the lost earnings award.[3]

■ Dr. Monias contends that future loss of wages is limited to the plaintiff's actual (shortened) life expectancy rather than the plaintiff's normal life expectancy had the tort not occurred. We reject his contention. In an action for personal injuries, a plaintiff may recover for loss of future earnings which will reasonably and probably result from the tort. *Adams v. Benson,* 208 Md. 261, 271, 117 A.2d 881, 885 (1955). We do not discard this fundamental rule of damages where the defendant's tort shortens the plaintiff's life expectancy.

■ The precise issue in the instant case was left open in *Rhone v. Fisher,* 224 Md. 223, 231–32, 167 A.2d 773, 779 (1961), where we held that generally a plaintiff is not entitled to recover damages for the "lost years" themselves

---

3. Loss-of-earnings damages recovered in a personal injury action would obviously preclude duplicative recovery of the same damages in a wrongful death action. In *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), a longshoreman who had sued for and recovered damages for his personal injuries died as a result of the injuries. His widow brought a wrongful death action. The Supreme Court held that the widow could not recover for her loss of support to the extent that her damages would overlap the award for loss of earnings in her husband's prior suit. *Id.* at 592, 94 S.Ct. at 818, 39 L.Ed.2d at 25. The Court stated "the tortfeasor should not be required to make further compensation in a subsequent wrongful-death suit for any portion of previously paid wages" and "application of familiar principles of collateral estoppel" would eliminate any problem of double recovery. *Id.; see also Restatement (Second) of Judgments* § 46(2)(b) (1982).

This case does not present, and so we do not address, the question of whether Maryland follows the majority of jurisdictions which hold that a prior personal injury judgment obtained by the decedent completely precludes any subsequent wrongful death action based on the same negligent conduct. 4 F. Harper et al., *The Law of Torts* § 24.6, at 471–72 & n. 1 (2d ed. 1986); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 127, at 955 & n. 18 (5th ed. 1984); *cf. Melitch v. United Rwys. & E. Co.,* 121 Md. 457, 462–63, 88 A. 229, 231 (1913) (held no action would lie under the former Wrongful Death Act, Article 67, § 1 of the Code of 1904, because decedent had executed a valid release of all claims he "might or could possibly have" on account of his injuries).

where the defendant's tort shortened the plaintiff's life expectancy. We noted in *Rhone* that the plaintiff failed to raise the issue of loss of earnings for the "lost years" and so that aspect of damages was not before the Court. *Id.* at 232, 167 A.2d at 779. We shall reach this issue in the instant case. We hold, in accord with the majority of other jurisdictions, that the proper measure of lost earnings damages in a personal injury action for a plaintiff whose life expectancy is reduced by the defendant's negligence is the plaintiff's loss of earnings based on the plaintiff's life expectancy had the tortious conduct not occurred, rather than loss of earnings based on the plaintiff's post-tort shortened life expectancy. "If the injury shortens plaintiff's life expectancy, the weight of American authority nevertheless computes future earning loss on the basis of the life expectancy plaintiff would have had without the injury." 4 F. Harper et al., *The Law of Torts* § 25.8, at 552 n. 9 (2d ed. 1986) and cases cited therein; *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 595, 94 S.Ct. 806, 819, 39 L.Ed.2d 9, 26 (1974) (holding that, "[u]nder the prevailing American rule, a tort victim suing for damages for permanent injuries is permitted to base his recovery 'on his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury*' " (quoting 2 F. Harper & F. James, *The Law of Torts* § 24.6, at 1293–94 (1956) (emphasis in original)).[4]

---

**4.** We should note that we are dealing with future loss-of-earnings damages, rather than future loss-of-earning-capacity damages. There is a distinction between loss of earnings and loss of earning capacity. See 4 F. Harper et al., *The Law of Torts* § 25.8, at 548–57 (2d ed. 1986); *Id.* at 549–50 ("A person is entitled to compensation for the lost *capacity* to earn, whether he would have chosen to exercise it or not." (Emphasis in original, footnote omitted.)); 2 M. Minzer et al., *Damages in Tort Actions* § 10.22[2], at 10–30 to 10–31 (1989) ("[M]ost courts which have discussed the subject have held that it is not necessary to show either the plaintiff's earnings prior to the injury or decrease in earnings after the injury in order to establish the fact of loss of earning capacity." (footnotes omitted)); *see also* D. Dobbs, *Remedies* § 8.1, at 540–41 (1973) (injured adult or child may recover

■ Damages for future loss of earnings must be based on the victim's life expectancy absent the tort rather than on the shortened life expectancy resulting from the tort. We will not permit the tortfeasor to reduce liability for the victim's loss of earnings by reducing the victim's life expectancy.

■ In the instant case, the trial judge separated the future loss-of-earnings damages into (1) future loss of earnings up to November, 1992, and (2) future loss of earnings from November, 1992 to age 65 when Ms. Endal would have retired based on her pre-injury life expectancy. The combination of both awards gave Ms. Endal what she is entitled to—her loss of future earnings based on her normal life expectancy had she been properly diagnosed and treated.

---

for diminished earning capacity even though the person never worked and never intended to work). While our holding only concerns future loss of earnings, we note that other authorities have permitted recovery for future loss of earning capacity during the lost years. For example, see the *Restatement (Second) of Torts* § 924, at 525–26 (1979), comment (d). *See also* Comment, *Compensation for Negligently Shortened Life Expectancy*, 29 Md.L.Rev. 24, 34–35 (1969) (concluding that, where tortfeasor's act results in diminution of plaintiff's life expectancy, "recovery *could* be had for the loss of earning capacity sustained during the years never to be lived") (emphasis in original); *Burke v. United States*, 605 F.Supp. 981 (D.Md.1985). In *Burke*, a case decided under Maryland law, the plaintiff brought a personal injury action to recover damages, including future loss of earning capacity, as the result of the defendant's failure to timely and properly diagnose her breast cancer. The medical experts agreed that Mrs. Burke, although clinically asymptomatic at the time of trial, had less than a 10% likelihood of surviving ten years. The medical experts also opined that had the defendant properly diagnosed Ms. Burke's condition, she would have had a 90% chance of survival with a normal life span without recurrence of cancer. Based upon these facts, the court in *Burke* held that,

"the plaintiff has a right to recover in this case for her loss of earning capacity, if any, which has been caused by the wrongful acts of the defendant for the period of time from the injury to the expiration of her work life expectancy *as it would have existed immediately prior to the time of the injury*." (Emphasis added).

*Id.* at 989; *Cf. Rhone*, 224 Md. at 233, 167 A.2d at 779.

## II. LOSS OF SERVICES

The loss-of-services damages in the instant case, like the loss-of-earnings damages, were subdivided into separate awards for pre and post "premature death" damages. Loss-of-services damages for the period before Ms. Endal's probable premature death were apparently included in either Ms. Endal's $200,000 "noneconomic damages" award or the Endals' $75,000 loss of consortium award.[5] The validity of these two awards is not in issue. The loss-of-services award that is at issue in the instant case is the "post premature death" award of $200,000 for "loss of household services to children." The Court of Special Appeals vacated this award, and we granted Ms. Endal's petition for certiorari to review this award. We shall affirm the intermediate appellate court.

In *Rhone v. Fisher*, 224 Md. at 230–31, 167 A.2d at 778, this Court held that, as a general rule, a plaintiff cannot recover damages for the "lost years" of shortened life expectancy caused by a defendant's negligence. We did, however, acknowledge that there might be two potential categories of recoverable damages relating to "lost years" of shortened life expectancy. The first category recognized in *Rhone* was mental suffering resulting from knowledge of the shortened of life expectancy. *Id.* In *Rhone*, we upheld a jury's award that included such damages. The second potentially permissible form of damages related to the "lost years" identified in *Rhone* was "lost earnings during the lost years," *id.* at 232, 167 A.2d at 779; however, that issue was not decided in *Rhone* because it was not preserved for appeal. It is this second category of damages, lost earnings for lost years, that we have approved in

---

5. Consortium damages are damages suffered by the marital entity. *Deems v. Western Md. Ry. Co.*, 247 Md. 95, 114–15, 231 A.2d 514, 525 (1967). The trial judge, without objection, properly instructed the jury that "[l]oss of consortium [is] ... only to be considered during the joint lives of the parties. Those damages would cease at the death of either party." The loss-of-consortium claim, like the marital entity, cannot extend beyond the actual life of either marital partner.

the instant case, *supra*. *Rhone* recognized only these two elements of damages as potentially permissible forms of damages related to the "lost years" of shortened life expectancy. The Endals, in essence, ask us to recognize an additional category—loss of services that the tort victim will not be able to provide to her family because of her shortened life expectancy. We decline to further expand *Rhone* to permit recovery for loss of services during the "lost years" of a plaintiff's shortened life expectancy. Ms. Endal contends that we should treat loss-of-services damages the same as loss-of-earnings damages, and thus allow loss-of-services damages for the "lost years" of shortened life expectancy. The Court of Special Appeals did not agree, nor do we. The Maryland cases Ms. Endal cites to support this argument clearly held that injured persons in personal injury actions are entitled to recover pecuniary damages for impairment of their ability to perform household duties, but none of these cases addresses whether, let alone holds that, loss-of-services damages should be awarded during the "lost years" of shortened life expectancy. Instead, they all concern temporary or permanent impairment without any discussion of the plaintiff's life expectancy. *See, e.g., Straughan v. Tsouvalos*, 246 Md. 242, 228 A.2d 300 (1967); *Hughes v. Carter*, 236 Md. 484, 204 A.2d 566 (1964); *Adams v. Benson*, 208 Md. 261, 117 A.2d 881 (1955). The same can be said for the out-of-state authorities and treatises on which Ms. Endal relies.

Further, the case for recognizing loss-of-services damages related to the "lost years" is not as compelling as the case for recognizing loss-of-earnings damages related to those years. Loss-of-earnings damages are to compensate a tort victim for income the victim will not *receive* because of the tort. Loss-of-services damages, on the other hand, are to compensate a tort victim for services the victim will not be able to *provide* because of the tort. In the instant case the "post premature death" loss-of-earnings damages were to compensate Ms. Endal for money that she will not receive because of her untimely death. The "post prema-

ture death" loss-of-services damages were to compensate for services Ms. Endal will not be able to perform for her family because of her untimely death. Obviously Ms. Endal will have no need for her own services following her premature death; these loss-of-services damages were to compensate Ms. Endal's family.[6] Damages for loss of services to family members, if recoverable at all, are properly pursued in a wrongful death action. We find no justification for a further extension of *Rhone*, and we hold that a tort victim in a personal injury suit is not entitled to loss-of-services damages for the period of the "lost years" of shortened life expectancy.

We also note that the award in the instant case for "loss of household services to children" is similar to a child's claim for "loss of parental consortium." A few jurisdictions have recognized a loss of consortium damage claim by minor children for injuries to a parent. *See* W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 125, at 935–36 (5th ed. 1984); S.G. Ridgeway, *Loss of Consortium and Loss of Services Actions: A Legacy of Separate Spheres*, 50 Mont.L.Rev. 349, 349 & n. 4 (1989). Maryland, however, has not recognized such a claim for children except in the context of a wrongful death action. We are not persuaded that this Court should further expand tort damages to include such loss-of-consortium type damages for a minor child whose parent is severely injured but not killed. *See Gaver v. Harrant*, 316 Md. 17, 28–32, 557 A.2d 210, 216–18 (1989) (discussing why Maryland has not recognized a damage claim for loss of parental society and affection).

---

**6.** We recognize that not every loss-of-services action will be for the benefit of a tort victim's family. Tort victims may also seek damages for loss of services they would have provided for themselves absent the injury. Loss of such services that would have been provided during the "lost years" should not be compensable, as the victim ought not be reimbursed for services never to be performed and never to be needed because of the victim's premature death.

Ms. Endal also argues that in light of Maryland's recognition of a limited claim for loss of the economic value of a child's services, *see* Maryland Code (1984, 1991 Repl.Vol.), Family Law Article, § 5–206; *Hudson v. Hudson*, 226 Md. 521, 528, 174 A.2d 339, 342 (1961), we should recognize a reciprocal loss of parental services claim on behalf of minor children. We also decline this invitation to further expand tort damages. For the same reasons we gave in *Gaver* for not recognizing children's loss of parental consortium claims, we also decline to recognize loss of parental service claims. If such a new cause of action is to be recognized, the legislature should do so after weighing such factors as the benefits of such a new cause of action, the probable increase in insurance costs, and the increased cost of litigation should children be made parties to their parents' tort suits. What we said in *Gaver* is equally applicable in the instant case:

> "We, of course, are not unmindful of the importance of the parent-child relationship, nor of the magnitude of loss suffered by a child when a parent is seriously injured. We conclude, however, that adoption of the proposed cause of action is not compelled by changing circumstances nor by a pressing societal need."

*Gaver*, 316 Md. at 33, 557 A.2d at 218.

 In summary, in tort actions where a family member is injured, the marital entity has a claim for damages for loss of a spouse's consortium, but parents and children do not have a claim for loss of each other's consortium. Parents have a limited common law claim for the economic value of the loss of an injured child's services, but children have no reciprocal claim for loss of an injured parent's services. A tort victim's loss of earnings damages are based on pre-tort life expectancy, but a tort victim's loss-of-services damages are based on actual post-tort life expectancy. Arguments can no doubt be made for expanding and equalizing damages, particularly for parent-child damage claims. Such expansion entails a host of public policy concerns, including potential for increasing insurance costs,

adding to litigation expenses by making children parties to a parent's tort action, as well as the uncertainty and remoteness of such damages. The task of balancing these concerns can best be undertaken by the General Assembly, rather than by this Court.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THE COURT OF SPECIAL APPEALS AND IN THIS COURT TO BE PAID THREE–FOURTHS BY PETITIONER AND ONE–FOURTH BY RESPONDENT.